Betty Douglas Wilson, Transferee v. Commissioner. Virginia Douglas Dawson, Transferee v. Commissioner.
Wilson v. Commissioner
Docket Nos. 49836, 49837.
United States Tax Court
T.C. Memo 1955-88; 1955 Tax Ct. Memo LEXIS 252; 14 T.C.M. (CCH) 299; T.C.M. (RIA) 55088; April 14, 1955
*252 Held, gifts by decedent-donor, Lloyd C. Douglas, within 3 years of his death, were not in contemplation thereof. Alan E. Gray, Esq., 530 West 6th Street, Los Angeles, Calif., and Daniel W. Chapman, Esq., for the petitioners. Joseph G. White, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated transferee proceedings involve a deficiency in estate tax determined by the respondent against the Estate of Lloyd C. Douglas in the amount of $11,171.05. The petitioners have conceded their transferee liability if the respondent's determination of the deficiency is upheld. The only issue is whether gifts in the amount of $41,000 made by decedent, Lloyd C. Douglas, in 1948 and 1949, within *253 3 years of his death, were in contemplation thereof as presumed by section 811(c) of the Internal Revenue Code of 1939. [1]
*254 Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Betty Douglas Wilson and Virginia Douglas Dawson (hereinafter sometimes referred to as the petitioners) were the residuary legatees of their father, Lloyd C. Douglas (hereinafter referred to as the decedent), who died on February 13, 1951, a resident of Las Vegas, Nevada. Petitioner Betty Douglas Wilson's husband, J. Weldon Wilson, was the executor of decedent's estate, and filed the Federal estate tax return therefor with the collector of internal revenue at Reno, Nevada, on August 30, 1951. Such return reported a gross estate of $253,069.16 and allowable deductions of $57,004.47. Decedent, who was born in 1877, was an ordained minister and a distinguished author. His first novel, "Magnificent Obsession," was published in 1929. In 1942 his best selling novel, "The Robe," was published. He was, at that time and until 1945, a resident of Los Angeles, California. In the Fall of 1944, decedent developed pneumonia and a severe arthritic condition and was hospitalized continually from that time until May 1945. He was crippled with arthritis throughout *255 the remainder of his life. In addition to decedent's arthritic condition, he also had diabetes. He developed a heart condition late in 1949 and died from congestive heart failure in 1951. Decedent at all times was fully aware of his state of health and the nature of his illness. Decedent and members of his family had suffered from many illnesses over the years - some of a serious nature. He wrote in 1940: "Everybody gets sick. Even the dog has been sick." "Verily, we are an unhealthy tribe." In the Summer of 1944, decedent conceived the idea for a new novel based on the life of the disciple, Peter, to be called "The Big Fisherman." His wife died in December of that year; and subsequent to his release from the hospital in 1945, decedent went to Las Vegas, Nevada, where he resided at a ranch and began working on the planned novel. Betty Douglas Wilson was a resident of Las Vegas, and in the Fall of 1945 purchased a home and added thereto an apartment which was occupied by the decedent. Decedent gave her $10,000 on September 21, 1945, toward the purchase of the home and in 1946 gave her an additional $12,000 primarily to reimburse her for remodeling costs. Also, in 1946, he gave his *256 other daughter and co-petitioner herein, Virginia Douglas Dawson, $12,500. He wrote her as follows: "* * * You may recall that I told you, some time ago, that I would make you a gift of $10,000 when my Canadian balance warranted it. Here is half of it, my dear, and the other half will be coming along early in July, I think. It gives me much pleasure to do this for you and I hope you will have a good time putting it into circulation." * * *
From 1937 throughout the remaining years of his life, decedent [2] paid the following amounts of income tax: Year
Amount
1937
$ 12,666.18
1938
8,937.96
1939
4,389.20
1940
10,040.72
1941
2,963.27
1942
5,211.57
1943
203,531.60
1944
131,886.15
1945
68,289.53
1946
29,944.05
1947
12,704.53
1948
100,564.10
1949
98,048.89
1950
60,849.47
1951
18,765.86
Following the publication of "The Robe," from which decedent received large royalties, he was much concerned with the heavy burden of taxes. He retained tax counsel from 1944 until his death. Decedent completed "The Big Fisherman" in August *257 of 1948. That novel enjoyed the greatest advance sales of any novel theretofore published. Decedent and his publishers had expected that the book would be well received, and decedent had attempted to devise some plan whereby he might effect tax savings by having the copyright issued jointly in his name and the names of the petitioners herein. He wrote his publishers in February 1946, as follows: "* * * My income taxes, in recent years, have been so nearly confiscatory that I am eager to learn of any process whereby this heavy burden may be eased. My permissible deductions are negligible. It costs me very little to do business. I have no intention of attempting any tax evasion, but I have a right to do what I can at tax avoidance." * * * After carefully considering several plans, decedent did not adopt one for fear that it would not be acceptable to the Commissioner. Early in 1948, decedent received a refund of approximately $30,000 from his 1944 income tax payments. Decedent sold all of his securities in May 1949, receiving therefor $70,655.58. From such proceeds, he repaid a $20,000 loan and donated $12,500 to a church building program. Decedent made the following *258 gifts during 1948 and 1949, and paid the gift tax thereon: To Betty
To Virginia
To
Douglas
Douglas
Bertha
Date of Gift
Wilson
Dawson
Kraft
Total
March 29, 1948
$ 5,000
$ 5,000
$10,000
Aug. 15, 1948
3,000
3,000
6,000
Dec. 25, 1948
5,000
5,000
10,000
June 6, 1949
5,000
5,000
10,000
Nov. 14, 1949
$ 5,000
5,000
Total
$18,000
$18,000
$ 5,000
$41,000
No financial need of the daughters prompted the gifts to them. Except for the gifts in 1946, the only gift of any size which decedent had ever made to them was to Betty Douglas Wilson in 1939, in the amount of $1,000 at Christmastime, to help her defray the cost of hospitalization during the course of an illness. Decedent felt no need to make elaborate provision for his daughters' welfare after his death, for as he wrote: "It isn't as if the future welfare of my children depended solely on what I might be able to leave to them. In both cases, the husbands of my daughters are (while not rich men) persons of considerable substance. They will miss no meals, regardless of what they might inherit from me. * * *" Bertha Kraft had been one of decedent's nurses during his *259 hospitalization in 1944 and 1945. Except for brief intervals in 1945 and 1946, she remained in decedent's employ as a nurse and companion from 1944 throughout the remaining years of his life. Decedent gave her birthday gifts and gifts on the anniversaries of her employment with him, each in the amount of several hundred dollars. A note accompanying the $5,000 gift to her in 1949, on the occasion of her fifth anniversary with him, was as follows: "Here is a token of my deep gratitude to you for your tireless devotion as my nurse and your sweet companionship as my friend during these past five years. "Blessings on you for everything." In his last will and testament, executed March 28, 1950, decedent bequeathed $5,000 to Bertha Kraft. In a previous will, executed in July 1945, he had bequeathed $500 to her. A number of small bequests were made to others in his last will. The petitioners were the residuary legatees of his estate. After the publication of "The Big Fisherman," decedent commenced work on an autobiography and finished the first volume thereof prior to his death. He considered the work as occupational therapy which kept his mind off his illnesses. The first part of *260 the autobiography, entitled "Time to Remember," was published in October 1951, after his death. He ended it as follows: "My publishers and I are agreed that it may be a couple of years or longer before my proposed book of recollections could be brought out. So, we have decided to publish it in two volumes. "The second volume will deal with my memories of life in the ministry and as a novelist. "I shall begin at once on Volume II. I hope to meet you there." The gifts which decedent made in 1948 and 1949, in the amount of $41,000, to the petitioners and to Bertha Kraft were not transfers made in contemplation of death. Opinion RICE, Judge: The petitioners have conceded their transferee liability if the respondent's determination of a deficiency in decedent's estate tax is upheld, hence, the entire burden here was on them to overcome the statutory presumption that gifts which decedent made to them and to Bertha Kraft in 1948 and 1949, totaling $41,000, were not transfers made in contemplation of death. We think the petitioners have succeeded in carrying their burden of proof. The record here contained many letters, most of them written by decedent; a copy of his autobiography, *261 entitled "Time to Remember;" a copy of the petitioners' biography of him, entitled "The Shape of Sunday;" and other documentary evidence introduced for the general purpose of showing the decedent's state of mind, particularly from 1944 until the time of his death. We have carefully reviewed all of that evidence, together with the testimony of one of decedent's daughters, of Bertha Kraft, and of decedent's tax counsel. We are satisfied from the evidence presented that the gifts in question, although made within 3 years of decedent's death, were not made in contemplation thereof. The Supreme Court said in United States v. Wells, 283 U.S. 102, 118 (1931): "If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * *" We think the gifts here in question were made in connection with motives associated with life. The decedent's age and his state of health are about the only facts here which lend any substance to the presumption of the statute. Decedent was 70 and 71 years of age when the gifts were made. However, *262 age in itself is not the decisive test of the motive prompting the transfers. United States v. Wells, supra; Estate of Charles J. Rosebault, 12 T.C. 1 (1949), Estate of Oliver Johnson, 10 T.C. 680 (1948). Admittedly, decedent's health was poor; but illnesses in his family had been frequent and of a serious nature over a period of many years. Arthritis, which was the illness from which he was suffering when the gifts in question were made, was not the cause of his death and no evidence in the record indicates that he expected that death was imminent or would even eventually result from that disease although it caused him much pain and physical discomfort. Decedent did not develop a heart condition until late in 1949 and his death from congestive heart failure did not occur until 1951. To buttress the presumption of the statute, the respondent also argued that decedent was very tax conscious and, hence, that the gifts in question were made to avoid estate taxes. The record contains much evidence reflecting decedent's concern over taxes. His concern, however, was primarily over income taxes - a concern most definitely associated with life. Estate of Charles J. Rosebault, supra. *263 Prior to the publication of "The Robe," the decedent's annual income tax bill, commencing in 1937, had ranged from approximately $3,000 to $12,000. From 1943 until his death, he paid a total of $724,584.18 in income taxes. Quite understandably, he was anxious to use any legitimate means to minimize taxes, which explains the consideration he gave to the possibility of having the copyright for "The Big Fisherman" issued to his two daughters and himself as equal owners. We think the dominant motive which prompted the gifts in question was the simple enjoyment which decedent derived from making such gifts. In every instance the gifts were made after he had received a large sum of money or on the occasion of some anniversary. The gifts in March of 1948 to his two daughters were made after he had received a large income tax refund. The gifts to them in August of that year were after he had completed "The Big Fisherman," and the remaining gifts to them in that year were at Christmastime. See Estate of C. Dudley Wilson, 13 T.C. 869 (1949), affd. 187 Fed. (2d) 145 (C.A. 3, 1951); Black v. United States, 68 Fed. Supp. 74 (N.D. Ohio 1946), affd. 164 Fed. (2d) 96 *264 (C.A. 6, 1947). The gifts to them in June 1949 were after he had sold some $70,000 of securities. The gift to Bertha Kraft was on the occasion of her fifth anniversary of service to the decedent and was to express his deep appreciation for such services. After his wife's death in 1944, he had only himself to provide for and made his home with one of his daughters. At the same time his income during those remaining years of his life was larger than ever before. He did not feel that it was necessary for him to make elaborate provisions for his daughters after his death since they were both married to men of "considerable substance." Our impression from the careful consideration which we have given to all of the evidence in this record is that, while decedent may have been in relatively poor physical health during the remaining years of his life, he was a man of great mental vitality. He had scarcely begun his major novel, "The Big Fisherman," in 1944 when he became severely crippled with arthritis. He, nevertheless, worked determinedly until the book was completed in 1948. As noted in our findings, it enjoyed the greatest advance sales of any novel ever before published; and decedent's *265 royalties from it were large. After completing that work, he undertook to write his autobiography, the first volume of which he completed before his death. He had every expectation of living to complete the second volume; and, for all that this record shows, perhaps undertake other literary work. We are satisfied that decedent's whole behavior was motivated by thoughts associated with life and that the gifts in question were not made in contemplation of death. Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(c) Transfers in Contemplation of, or Taking Effect at, Death. - (1) General Rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - (A) in contemplation of his death; or * * *
(1) Contemplation of Death. - If the decedent within a period of three years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of subsections (c), (d), and (f); but no such transfer, relinquishment, exercise, or release made prior to such three-year period shall be deemed or held to have been made in contemplation of death.↩
2. From 1937 to 1946, inclusive, decedent and his wife paid the amounts of income tax shown for such years.↩